IN the MATTER OF THE PROTECTIVE PLACEMENT
OF SUSAN H.:

JACKSON COUNTY DEPARTMENT OF HEALTH AND HUMAN
SERVICES, Petitioner-Appellant,

v.

SUSAN H., Respondent-Respondent.

Court of Appeals

*No. 2009AP1997. Submitted on briefs April 8, 2010.
—Decided May 27, 2010.*

2010 WI App 82

(Also reported in 785 N.W.2d 677.)

246

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Jackson County Corporation Counsel Rian W. Radtke* of *Skolos, Millis & Matousek, S.C.*, Black River Falls.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Brian C. Findley*, Darlington.

A guardian ad litem brief was filed by *Daniel S. Diehn* of *Daniel S. Diehn, S.C.*, Black River Falls.

Before Vergeront, Lundsten and Higginbotham, JJ.

¶ 1. VERGERONT, J. The Jackson County Department of Health and Human Services appeals the circuit court order continuing protective placement for Susan H. after determining that she continues to meet the criteria for protective placement under Wis. Stat. § 55.08(1) (2007–08).[1] The issue on appeal is the proper construction of § 55.08(1)(a), which requires that the person protectively placed have "a primary need for

_____

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

residential care and custody." The Department contends that a person does not have a primary need for residential custody when the person resides in a facility or home licensed for fewer than sixteen beds without verbal objection or active protest and with the guardian's consent pursuant to § 55.055. According to the Department, the order for protective placement must be terminated because the criteria of § 55.055 are met.

¶ 2. We reject the Department's construction as contrary to the plain meaning of WIS. STAT. § 55.08(1) and related statutes. We conclude as follows. (1) A person has a primary need for "residential . . . custody" in § 55.08(1)(a) when the person has a primary need to have someone else exercising control and supervision of the person in the person's place of residence for the purpose of protecting the person from abuse, financial exploitation, neglect, and self-neglect. (2) Neither the plain meaning of "custody" in § 55.08(1)(a) nor the case law requires a finding of involuntariness. (3) Because § 55.17 permits termination of a protective placement only if the standards of § 55.08(1) no longer apply, termination is not authorized based on § 55.055. Accordingly, we affirm the order for continuing protective placement.

## BACKGROUND

¶ 3. The statute at issue in this case is WIS. STAT. § 55.08(1), which provides:

> (1) Protective placement. A court may under s. 55.12 order protective placement for an individual who meets all of the following standards:
>
> (a) The individual has a primary need for residential care and custody.

(b) The individual is . . . an adult who has been determined to be incompetent by a circuit court.

(c) As a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities, the individual is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others . . . .

(d) The individual has a disability that is permanent or likely to be permanent.

¶ 4. Susan H. is fifty-nine years old and is physically and mentally disabled, with a diagnosis of mental retardation and spastic quadriplegia. Susan was first protectively placed by a court order under Wis. Stat. § 55.08(1)[2] in 1987 and a guardian was appointed at that time. Her diagnosis has remained the same. Since 1991, Susan has been protectively placed at SAM's House, a four-bed group home. Her current guardian was appointed in 2004.

¶ 5. Each year from 1988 through 2006 the Department conducted an annual review required by Wis. Stat. § 55.18 and concluded that Susan continued to meet the requirements of § 55.08(1), and each year the court ordered continued placement. In 2007, the Department's annual review did not indicate a change in Susan's condition or needs but recommended termination of the protective placement. The stated reason was that she was receiving the services and support she needed and her guardian was making appropriate decisions for her. After a hearing, the circuit court ordered that protective placement be continued.

---

[2] In 1987, this statute was numbered Wis. Stat. § 55.06(2) (1987–88).

¶ 6. In its 2008 annual review of Susan, the Department again recommended that protective placement be terminated. Like the 2007 report, the 2008 report does not describe changes in Susan's condition or needs. According to this report, Susan's physical health is "fragile, but stable." She is non-ambulatory and uses a wheelchair, relying on staff to move her, and she requires assistance with all her activities of daily living. She "needs supervision due to her inability to care for herself," and she "is able to express her needs, however, [the] providers have a hard time understanding her at times." The report concludes that, because of her developmental disabilities, Susan is so incapable of providing for her own care and custody as to create a substantial risk of serious harm to herself. The report also concludes that she does not have a primary need for residential care and custody. The basis for this conclusion is that, despite Susan's inability to provide for herself, she is safe and stable because of her current residential setting and the services she is receiving and because she has an active guardian advocating for her. On this ground, the Department recommended termination of the protective placement.

¶ 7. The guardian ad litem and the adversary counsel appointed for Susan both objected to the Department's recommendation, and the court held an evidentiary hearing. The court determined that Susan continued to meet the criteria for protective placement under Wis. Stat. § 55.08(1). The court rejected the Department's argument that Susan did not have a primary need for "custody" because she was residing at SAM's House with her guardian's approval and without objection by her.

## DISCUSSION

¶ 8. On appeal the Department renews its argument that "custody" properly defined has an involuntary component and that Susan does not have a primary need for custody because she is staying at SAM's House voluntarily—that is, with the consent of her guardian and without objection by her. The Department reasons that case law describes a "protective placement" as involuntary and therefore the criteria in Wis. Stat. § 55.08(1) must contain an element of involuntariness. The Department relies on § 55.055 for its position that Susan is voluntarily residing at SAM's House. This statute authorizes a guardian to consent to the ward's admission to certain facilities, including group homes licensed for fewer than sixteen beds, without a protective placement order. § 55.055(1)(a). If a person thus admitted "verbally objects to or otherwise actively protests such an admission," the head of the facility must notify the Department, which must visit the person and, if the person still protests, either have the person released or proceed with an emergency protective placement. § 55.055(3). Based on this statute, the Department contends that, because Susan's guardian has consented to her being at SAM's House—a four-bed facility of a type included in § 55.055(1)(a)—and because, in the Department's view, Susan has not "objected or actively protested," she is therefore residing there voluntarily, and thus she does not have a primary need for residential custody under § 55.08(1)(a).

¶ 9. Susan, through her adversary counsel, and Susan's guardian ad litem respond that the circuit court correctly gave the word "custody" its common meaning of control or supervision over someone for their own protection. They contend there is no support in the statutory language or the case law for interpreting a

"primary need for residential . . . custody" to exclude a person solely because the guardian consents to placement in a facility covered by Wis. Stat. § 55.055 and the person has not objected.

¶ 10. Resolution of this appeal requires that we construe and apply Wis. Stat. § 55.08(1)(a) and related statutes to the undisputed facts. This presents a question of law, which we review de novo. *Cambier v. Integrity Mut. Ins. Co.*, 2007 WI App 200, ¶ 12, 305 Wis. 2d 337, 738 N.W.2d 181. When we construe a statute, we begin with the language of the statute and give it its common meaning, except that technical or specially defined words are given their technical or special definitions. *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. We interpret statutory language in the context in which it is used, not in isolation but as part of a whole, in relation to the language of surrounding or closely related statutes, and we interpret it reasonably to avoid absurd or unreasonable results. *Id.*, ¶ 46. We also consider the scope, context, and purpose of the statute insofar as they are ascertainable from the text and structure of the statute itself. *Id.*, ¶ 48. We do so in part because words often have multiple meanings and the applicable definition depends upon the context in which a word is used. *See id.*, ¶¶ 48–49. If, employing these principles, we conclude the statutory language has a plain meaning, then we apply the statute according to that plain meaning. *Id.*, ¶ 46. We may use a dictionary to establish the common meaning of a word. *Swatek v. County of Dane*, 192 Wis. 2d 47, 61, 531 N.W.2d 45 (1995).

¶ 11. Turning to the statutory language at issue here, we observe that, although the term "care and

custody" forms part of the definition of "protective placement," WIS. STAT. § 55.01(6), and "protective placement facility," § 55.01(6m), neither "care" nor "custody" nor the combined term "care and custody" has a statutory definition.[3] Case law explains that a need for treatment does not constitute a "primary need for residential care and custody." *See Zander v. County of Eau Claire*, 87 Wis. 2d 503, 514, 275 N.W.2d 143 (1979). However, it does not appear that any case gives further definition to the meaning of that phrase in § 55.08(1)(a).

¶ 12. In the absence of statutory and case law definitions, we look first to the purpose of Chapter 55. The purpose of protective placements (as well as protective services) is to protect persons with developmental disabilities and "other like incapacities" from "abuse, financial exploitation, neglect, and self-neglect" in a manner that is consistent with due process and that "place[s] the least possible restriction on personal liberty and exercise of constitutional rights . . . ." WIS. STAT. § 55.001.[4]

---

[3] "Protective placement" is defined as "a placement that is made to provide for the care and custody of an individual." WIS. STAT. § 55.01(6). "Protective placement facility" is defined as "a facility to which a court may under s. 55.12 order an individual to be provided protective placement for the primary purpose of residential care and custody. § 55.01(6m).

[4] WISCONSIN STAT. § 55.001 provides in full:

Declaration of policy. The legislature recognizes that many citizens of the state, because of serious and persistent mental illness, degenerative brain disorder[s], developmental disabilities, or other like incapacities, are in need of protective services or protective placement. Except as provided in s. 49.45(30m)(a), the protective services or protective placement should, to the maximum degree of feasibility under programs, services and resources that the county board of supervisors is reasonably able to provide within the limits of available state and federal funds and of county funds required to

¶ 13. The standard dictionary definition of "care" applicable in this context is "the process of providing for the needs of someone." CAMBRIDGE DICTIONARY OF AMERICAN ENGLISH 123 (2000).[5] "Residential care" is thus the provision of a person's daily needs in the place where the person resides.

█

¶ 14. The Department's proffered definition of "custody," from BLACK'S LAW DICTIONARY 390 (7th ed. 1999), is "[t]he care and control of a thing or person for

be appropriated to match state funds, allow the individual the same rights as other citizens, and at the same time protect the individual from financial exploitation, abuse, neglect, and self-neglect. This chapter is designed to establish those protective services and protective placements, to assure their availability to all individuals when in need of them, and to place the least possible restriction on personal liberty and exercise of constitutional rights consistent with due process and protection from abuse, financial exploitation, neglect, and self-neglect.

[5] The Department suggests that we look at the definition of "residential care apartment complex" in WIS. STAT. § 50.01(1d), which provides "supportive, personal and nursing services" to persons who reside there. Each of these categories of services is defined in WIS. ADMIN. CODE § DHS 89.23(2)(a)2. (Nov. 2008). The circuit court adopted the combined services from all three categories as a definition of "residential care" in § 55.08(1)(a): "provid[ing] meals, housekeeping, laundry, and access to medical services, and daily assistance with all activities of daily living, which at a minimum, includes dressing, eating, bathing, grooming, toileting, transferring, walking or moving about from place to place, and monitoring medication administration and/or management." While these services are no doubt examples of the services a person who has a "primary need for residential care" would need, we see no reason to define the term "residential care" in § 55.08(1)(a) with reference to the services provided by a specific type of facility licensed under Chapter 50 ("Uniform Licensure").

inspection, preservation, or security."[6] This is consistent with the standard non-legal definition: "Care, supervision and control exerted by one in charge." AMERICAN HERITAGE DICTIONARY 450 (4th ed. 2000). We note that both these definitions of "custody" use the word "care," indicating that the meaning of "care" and the meaning of "custody" overlap somewhat, at least in the context of Chapter 55. However, a characteristic of "custody" that is not included in the meaning of "care" is control and supervision. Because both "care" and "custody" are used in WIS. STAT. § 55.08(1)(a) and because they are used in the disjunctive in § 55.08(1)(c) ("incapable of providing for his or her own care *or* custody") (emphasis added), we presume the legislature intended distinct meanings. *See Armes v. Kenosha Cnty.*, 81 Wis. 2d 309, 318, 260 N.W.2d 515 (1977) (when the legislature uses similar but different terms in a statute, particularly within the same section, courts presume the legislature intended the terms to have different meanings). In addition, we take into account the statutory purpose of protecting "from abuse, financial exploitation, neglect, and self-neglect." § 55.001. We therefore conclude the meaning of "custody" in § 55.08(1)(a) means control and supervision in order to provide this protection.

---

[6] The Department also refers us to the definition of "protective custody" ("[t]he government's confinement of a person for that person's own security or well-being, such as . . . an incompetent person who may harm others") and the definition of "physical custody" ("[c]ustody of a person . . . whose freedom is directly controlled and limited"). BLACK'S LAW DICTIONARY 390 (7th ed. 1999). We do not discuss either of these definitions because neither "protective custody" nor "physical custody" is used in WIS. STAT. § 55.08(1).

¶ 15. "Residential" plainly modifies "custody" as well as "care" because there is no reason to order placement in a facility if the needed control and supervision can be provided while the person lives independently. "Residential custody" thus means that the control and supervision is exercised by persons present in the place where the person who needs protection resides.

¶ 16. In summary, applying the common meaning of the phrase "primary need for residential care and custody" in Wis. Stat. § 55.08(1)(a), in light of the declaration of policy in § 55.001, we conclude the person must have a primary need (1) to have his or her daily needs provided for in a residential setting; and (2) to have someone else exercising control and supervision in that residential setting for the purpose of protecting the person from abuse, financial exploitation, neglect, and self-neglect. This is essentially the construction the circuit court adopted.

¶ 17. As noted above, "care" and "custody" are also used in Wis. Stat. § 55.08(1)(c), and we briefly address the construction of this subsection because the parties have done so. Section 55.08(1)(c) provides that the person must, by reason of developmental disabilities or other like incapacities, be "so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others." We presume the legislature intended "care" and "custody" to each have the same meaning here as in § 55.08(1)(a). *See Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 663, 539 N.W.2d 98 (1995) (courts presume that, each time the legislature uses the same word within one section, it intended the word to have the same

meaning). Thus, as to "care," § 55.08(1)(c) means that the person's incapacity to provide for his or her daily needs creates a substantial risk of serious harm to the person or others. As to "custody" in § 55.08(1)(c), its use in the sentence as structured is unusual because custody is not something that a person provides for himself or herself. However, despite the oddity of the usage, the only reasonable construction of the "custody" alternative in § 55.08(1)(c) is that the person cannot provide for himself or herself the protection from abuse, financial exploitation, neglect, and self-neglect that the control and supervision by others can provide.

¶ 18. We now turn to the Department's argument that the term "custody" has an involuntary component and this excludes Susan because she is voluntarily at SAM's House. There are two parts to this argument: (1) case law establishes that protective placement is involuntary and the word "custody" is the logical term in Wis. Stat. § 55.08(1)(a) to convey this concept; and (2) Susan is voluntarily at SAM's House by virtue of § 55.055.

¶ 19. As to the first part of the Department's argument, we have adopted the Department's definition of "custody," and that definition does not mention "involuntariness," although it is true that a person's consent is not required under the common meaning of "custody." We disagree with the Department that the case law requires that "custody" in Wis. Stat. § 55.08(1)(a) be interpreted to require a finding of involuntariness.

¶ 20. In the cases cited by the Department, the word "involuntary," read in context, is used to convey that a court-ordered protective placement does not require the person's consent. *See, e.g., State ex rel. Watts v. Combined Cmty. Servs. Bd.*, 122 Wis. 2d 65, 76–77, 362 N.W.2d 104 (1985) (In concluding that there must be an

annual judicial review of each protective placement, the court observes that protective placements "are the only involuntary commitments under Wisconsin law that are indefinite in duration . . . ."); *N. N. v. County of Dane*, 140 Wis. 2d 64, 69, 409 N.W.2d 388 (Ct. App. 1987) (In concluding that the predecessor to Wis. Stat. § 55.13(3) did not permit an extension of the requirement that the final hearing on a temporary protective placement be held within a prescribed time period, we stated that "[t]emporary placement under ch. 55, Stats., is an involuntary restraint on the individual's freedom.").

¶ 21. However, the fact that persons may be protectively placed under Wis. Stat. § 55.08(1) involuntarily —that is, without their consent or in spite of their objection—does not mean that this subsection requires a finding of involuntariness. There is nothing in the language of § 55.08(1)(a), (b) or (c), to indicate this. Moreover, the severe incapacities that are described in §§ 55.08(1)(c) and 55.001 are inconsistent with hinging a protective placement on the wishes of the person that is the subject of the petition.

¶ 22. We conclude that the meaning of "custody" in Wis. Stat. § 55.08(1)(a) does not require a finding of involuntariness. While we could end our analysis here, we address the second part of the Department's argument in order to clarify the relationship between § 55.055, on which the Department relies, and § 55.17, which governs the termination of protective placements.

¶ 23. As noted above, Wis. Stat. § 55.055(1)(a) permits a guardian of a person who has been adjudicated incompetent to "consent to the individual's admission to [certain facilities, including group homes] without a protective placement order . . . if the home or facility is

licensed for fewer than 16 beds."[7] The Department contends that this obviates the need for a protective placement order for Susan because her guardian consents to her placement at SAM's House and Susan need not consent. The Department acknowledges that under § 55.055(3), if Susan "verbally objects to or otherwise actively protests such an admission," she would need to meet the criteria for a protective placement order to continue staying there.[8] The Department's position is

---

[7] WISCONSIN STAT. § 55.055(1)(a) provides in full:

The guardian of an individual who has been adjudicated incompetent may consent to the individual's admission to a foster home, group home, or community-based residential facility, as defined under s. 50.01(1g), without a protective placement order under s. 55.12 if the home or facility is licensed for fewer than 16 beds. Prior to providing that consent, and annually thereafter, the guardian shall review the ward's right to the least restrictive residential environment and may consent only to admission to a home or facility that implements that right.

[8] WISCONSIN STAT. § 55.055(3) provides:

If an individual admitted under sub. (1) verbally objects to or otherwise actively protests such an admission, the person in charge of the home, nursing home, or other facility shall immediately notify the county department for the county in which the individual is living. Representatives of that county department shall visit the individual as soon as possible, but no later than 72 hours after notification, and do the following:

(a) Determine whether the protest persists or has been voluntarily withdrawn and consult with the individual's guardian regarding the reasons for the admission.

(b) Attempt to have the individual released within 72 hours if the protest is not withdrawn and the individual does not satisfy all standards under s. 55.08(1) or criteria under 55.135(1) [emergency and temporary protective placement] and provide assistance in identifying appropriate alternative living arrangements.

(c) Comply with s. 55.135, if the individual satisfies all criteria under s. 55.135(1) and emergency placement in that home, nurs-

that the record establishes that Susan has not verbally objected or otherwise actively protested placement at SAM's House.

██

¶ 24. The flaw in this argument is that it overlooks the criteria for termination of a protective placement in WIS. STAT. § 55.17. Under this section, the court may order a termination of a protective placement only if the standards in § 55.08(1) are no longer met; if they are met, the court must order a continuation, though it may change the placement if the person is not in the least restrictive setting. § 55.17(3)(a)-(c). Nowhere does this section provide that the court may terminate an order for protective placement if under § 55.055(1) the person could remain in the facility without a protective placement order.

¶ 25. Whether Susan could have been admitted to SAM's House initially without a protective placement order under WIS. STAT. § 55.055 is therefore irrelevant. She was under a protective placement order when she was admitted and § 55.17 applies to the termination of that order.

¶ 26. WISCONSIN STAT. § 55.17(3)(c) *does* mention § 55.055, but not as a ground for termination. Section 55.17(3)(c)3. provides that a person whose protective placement is terminated "under this paragraph," if the protective placement facility has fewer than sixteen beds, "may remain in the protective placement facility as long as the requirements of s. 55.055 are met." The reference to "this paragraph" is to § 55.17(3)(c), which provides that the court shall terminate the protective placement if "the individual no longer meets the stan-

---

ing home, or other facility or another home, nursing home, or other facility is necessary, or file a petition for protective placement . . . .

dards under s. 55.08(1) . . . ." Thus, the statutory language plainly shows that the legislature was aware of § 55.055 but chose not to permit termination of a protective placement on any ground other than no longer meeting the standards of § 55.08(1).[9]

¶ 27. Because we conclude that the termination of Susan's protective placement may occur only if she no longer meets the standards of WIS. STAT. § 55.08(1), the only potential issue remaining is whether the court properly determined that she continued to meet these standards. However, the Department's challenges to the circuit court's findings are premised on its view that compliance with § 55.055 is a ground for termination of Susan's protective placement. The Department does not contend that, if the circuit court correctly rejected this argument and correctly construed § 55.08(1)(a), its determination that Susan continued to meet the standard is erroneous.

## CONCLUSION

¶ 28. The circuit court correctly rejected the Department's construction of "custody" in WIS. STAT. § 55.08(1)(a) and correctly determined that Susan continued to meet the standards of § 55.08(1). Accordingly, we affirm the order for continued protective placement.

*By the Court.*—Order affirmed.

---

[9] Susan and the guardian ad litem make other objections, including constitutional objections, to a construction of WIS. STAT. § 55.055 that obviates the need for a protective placement. We do not address these because we decide on the narrower ground that § 55.17 does not permit a termination of a protective placement based on § 55.055.